## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| GREANEX LLC, UNIPER GLOBAL COMMODITIES SE, and UNIPER GLOBAL COMMODITIES NORTH AMERICA LLC,<br><br>  Plaintiffs,<br><br> v.<br><br>RAINER TRIEM, SOTACO LLC, and SOTACO INC. LIMITED,<br><br>  Defendants. | C.A. No. _____<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiffs Greanex LLC ("Greanex"), Uniper Global Commodities SE ("UGC SE"), and Uniper Global Commodities North America LLC ("UGC NA," with UGC SE and its affiliates, "Uniper," and with UGC SE and Greanex, "Plaintiffs") bring this action against Defendants Rainer Triem ("Triem"), Sotaco LLC ("Sotaco LLC"), and Sotaco Inc. Limited ("Sotaco Inc.," with Sotaco LLC, "Sotaco," and with Triem, "Defendants") for (i) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), (ii) conspiracy to commit RICO, (iii) fraud, (iv) breaches of fiduciary duty, (v) aiding and abetting breaches of fiduciary duty, (vi) civil conspiracy, (vii) unjust enrichment, and (viii) breach of contract.  Plaintiffs assert the following in support of their claims:

### NATURE OF THE ACTION

1.     This action arises from a massive fraudulent scheme committed by all Defendants and Witnesses A and B (the "Triem Fraud Team") in connection with a joint venture named Greanex.  Triem controls and owns Sotaco Inc., which owns and controls Sotaco LLC.  Sotaco

LLC holds a forty-nine (49) percent interest in Greanex, and UGC NA holds the remaining fifty-one (51) percent interest.  Greanex was formed to develop and commercialize technology to sort and produce commercially usable coal from piles of waste coal (known as "gob piles") for sale into the international coal markets.

2.     The Triem Fraud Team systematically used Greanex to defraud Uniper and to enrich themselves.  Losses from the scheme to defraud are in excess of $36 million.  As set forth below, Triem did not act alone in the perpetration of this fraudulent scheme.  Triem used his wholly-owned investment vehicles, Sotaco LLC and Sotaco Inc., as vehicles to receive kickbacks on his behalf, generate false capital contribution statements, submit fake invoices, divert funds, and scam potential third party investors.  Triem also used his close associate ("Triem Associate 1") to, on information and belief, knowingly sign off on and approve unsubstantiated invoices.

3.     The fraud consisted of several interrelated schemes.  First, Triem fraudulently induced Uniper to enter into the Greanex joint venture by falsifying the amount of Sotaco LLC's capital contribution.  In reliance on this facet of the fraud, Uniper was initially defrauded of the $1 million it loaned to Greanex in connection with setting up the joint venture.

4.     Next, knowing that Uniper would cease funding the venture if Greanex failed to produce the volume of coal Triem predicted, Triem directed one employee of Greanex ("Witness A") and an employee of a different company that serviced Greanex ("Witness B") to falsify the tonnage amounts being reported to Uniper.  To operationalize the false tonnage reporting, Triem caused the creation of two sets of books: (1) the accurate (meaning low) tonnage amount that would be distributed between Triem, Witness A, and Witness B; and (2) the false numbers that were reported to Uniper.  Not knowing that the tonnage was being grossly inflated, Uniper advanced another $33.927 million to Greanex through a series of coal pre-purchases agreements.

5.      Closely related to the false tonnage reporting scheme, Triem also defrauded Uniper by instructing third party coal processing companies to incorporate unusable "fines" and other coal waste products into the coal shipped to Uniper, all for the purpose of falsely inflating the volumes of coal Uniper thought it was receiving.

6.      Another component of the fraudulent scheme involved the diversion or theft of monies belonging to Greanex.  Accountants at UGC SE learned that Greanex had paid a vendor twice for the same invoice and requested a refund of the overpayment.  Even though the money belonged to Greanex, Triem instructed the vendor to wire the money to Sotaco Inc. in Hong Kong.  Triem lied by falsely claiming that the money was owed by Greanex to Sotaco.

7.      Triem also regularly used Greanex as a vehicle for generating kickbacks.  Triem instructed a Greanex vendor (Contractor B) to submit inflated bids for work.  Triem Associate 1 would, on information and belief, knowingly approve each of these inflated bids and recommend that Uniper pay each invoice.  Triem told Contractor B that the excess payments would have to be kicked back to him in the form of "commissions."  Triem and Sotaco received at least $640,000 through this kickback scheme.  A variant of this scheme was to include costly goods and services in contracts awarded to another Greanex contractor (Contractor A), but not require the contractor to complete the work or provide such goods and services in order to be paid.  Triem would pocket the Greanex overpayment as a kickback.  Once again, Triem Associate 1, on information and belief, knowingly approved these false invoices for payment by Greanex.  Sotaco and Triem received $615,000 through this facet of the scheme.

8.      The kickback scheme extended to the purchase of expensive capital equipment.  The key machinery used in the venture was equipment manufactured and sold by a German company.  Triem committed to the purchase of at least fifteen x-ray sorting machines at a cost of

$12,232,500, even though only a fraction of those machines were needed by Greanex operations. Triem secretly, and unilaterally, negotiated a deal with the German company that if Greanex purchased nine (9) machines, he could elect to either have Greanex receive a tenth (10) x-ray sorting machine for free, or Sotaco could receive an amount equal to the balance outstanding on the first x-ray sorting machine Sotaco had leased, approximately $500,000.[1]  This was essentially a kickback option to Sotaco and Triem for at least $500,000.  Even though only nine x-ray sorting machines would have been enough to generate the kickback option to Triem, on information and belief, Plaintiffs allege that ordering even more than nine x-ray sorting machines was part of Triem's plan to make Greanex appear to be larger and more successful than it really was in order that, as discussed below, he could defraud a future unwitting purchaser of his interests in the joint venture.

9.      Another aspect of the fraud involved Triem causing Sotaco LLC to send invoices in the hundreds of thousands of dollars of expenses for payment by Greanex knowing the expense reimbursement requests were false.  As an example, on February 25, 2019, Triem invoiced Greanex $200,000 through Sotaco LLC for the setup of the Harlan pile.  This invoice was approved by Triem Associate 1 for payment by Greanex and sent to Uniper for payment, notwithstanding the invoice was false.

10.     The final phase of the scheme involved Triem's effort to sell all or a portion of the membership interests in Greanex to an unsuspecting purchaser (the "Non-Uniper Related Target Victim").  By falsifying tonnage data and unnecessarily purchasing a large number of x-ray sorting machines, Triem hoped to create the impression that Greanex was a thriving and growing business.

---

[1] Triem lied to Uniper at the outset of the Greanex joint venture and told Uniper that Sotaco owned the first x-ray sorting machine.  Based on this lie, he sold Uniper the x-ray sorting machine for approximately $1 million.  In fact, Sotaco had only leased the x-ray sorting machine and still owed approximately $500,000 to the German company.

4

In fact, Greanex was failing and kept afloat only through fraudulently obtained funding from Uniper.  Triem falsified the true nature of Greanex's financial condition in his description of the joint venture to the Non-Uniper Related Target Victim in a failed effort to sell Sotaco LLC's interest in Greanex to it.  Uniper, as the majority member of Greanex, would have had to approve the proposed sale of Sotaco LLC's interest, as well as amend certain other contractual relationships with Greanex in ways that would have substantially disadvantaged Uniper (to Sotaco and Triem's benefit).  Uniper was not aware of the fraudulent scheme at this time and disapproved of the proposed sale for reasons independent of the fraud.

11.     Through the scheme to defraud set forth herein, Greanex and Uniper have been injured in excess of $36 million.  This Complaint seeks to hold Triem and other wrongdoers accountable.

**THE PARTIES**

A.     **Plaintiffs.**

12.     Greanex is a limited liability company formed under the laws of the State of Delaware with its principal place of business located at 181 W. Madison Street, Suite 3450, Chicago, Illinois 60602.  Greanex's coal mining operations have been located in Harlan and Pike counties in Kentucky.

13.     UGC SE is a company registered in the Federal Republic of Germany having its principal place of business located at Holzstrasse 6, 40221 Düsseldorf, Germany.

14.     UGC NA is a limited liability company formed under the laws of the State of Delaware with its principal place of business located at 181 W. Madison Street, Suite 3450, Chicago, Illinois 60602.

**B.      Defendants.**

15.     On information and belief, Triem is a resident of the Federal Republic of Germany. At all times relevant, Triem was Sotaco LLC's representative on the Board of Managers of Greanex, and he was Greanex's President, Chief Executive Officer, and Secretary of Greanex until the early fall of 2019.

16.     On information and belief, Sotaco LLC is a limited liability company formed under the laws of the State of West Virginia with its principal place of business located at P.O. Box 11070 Charleston, WV 25301, and it is controlled and owned by Sotaco Inc.

17.     On information and belief, Sotaco Inc. is a Hong Kong S.A.R. corporation with its principal place of business located at One Queens Road, Central Hong Kong, Hong Kong, S.A.R., and it is controlled and owned by Triem.

**C.      Non-Party Participants.**

18.     Witness A was an employee of Greanex, and he was responsible for the day to day operations at the Kentucky job sites.  Triem was Witness A's boss.  Witness A and Triem were in almost daily communication.  Triem ordered all of the fraudulent activity undertaken by Witness A.

19.     Witness B is an employee of a company that was hired by Triem to operate the Phelps and Harlan gob piles for Greanex.  Although he was employed by a different company, because Greanex was the sole funding source for his job, Witness B took his direction from Triem. Triem ordered all of the fraudulent activity undertaken by Witness B.

20.     Witness A and B voluntarily disclosed the fraud to Uniper along with many of the details set forth in this complaint.

## JURISDICTION AND VENUE

21.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because this action brings claims "arising under the Constitution, laws or treaties of the

United States"; namely, the Racketeer Influenced and Corrupt Organizations Act.

22.     This Court has personal jurisdiction over Defendants because they routinely

transact business in Kentucky or took actions adverse to Plaintiffs as part of a conspiracy there.

23.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) because the

events giving rise to this suit occurred in and around Harlan and Pike counties in Kentucky.

## FACTUAL BACKGROUND

### A.     Triem Fraudulently Induced Uniper to Form Greanex as a Joint Venture.

24.     Uniper is a global energy company that is active in the United States coal markets

as well as other global commodities markets.

25.     In the second half of 2015, certain individuals then employed by Uniper (known as

E.ON at that time) were approached by Triem regarding a possible new business venture.  Triem

marketed himself as an expert in the production of commercially usable (saleable) coal from gob

piles using a technology long established in other mining industries, but that had yet to be used to

scale in the North American coal industry.

26.     This technology was a x-ray sorting coal-sorting machines,[2] which Triem claimed

to have the exclusive right to use in the United States.  Triem also claimed to own a x-ray sorting

machine (referred to above and below, as "the first x-ray sorting machine"), to have an established

network of industry contacts needed to get the proposed venture up and running, and to be willing

---

[2] X-ray sorting machines are advertised as providing an energy efficient and cost effective way to identify
and sort target materials (in this case, saleable coal from the waste coal in gob piles) using sensors and x-
rays.

to contribute the x-ray sorting machine he owned to a joint business venture that Triem would form with Uniper.

27.     On July 6, 2016, UGC NA entered into a Membership Interest Purchase Agreement whereby an entity controlled by Triem, Sotaco LLC, acquired a forty-nine (49) percent membership interest in Greanex, which would serve as the vehicle for Triem and Uniper's joint venture.  Under the agreement, the remaining fifty-one (51) percent would be owned by UGC NA.

28.     On the same date, UGC NA and Sotaco LLC amended Greanex's Operating Agreement (the "Operating Agreement") to set forth the rights, duties, and obligations of the Members and Managers of Greanex.

29.     Under the Operating Agreement, the Board of Managers is responsible for "supervis[ing] the conduct of the Business and the affairs of the Company."  In this regard, UGC NA is entitled to appoint two of the three members of the Board of Managers and Sotaco is entitled to appoint the third.  Sotaco appointed Triem as its representative on the Board of Managers in 2016 and, on information and belief, Triem continues to hold that position today.

30.     In addition, the Greanex Board of Managers is entitled to "delegate its management responsibility to officers, including a President (which office may also be referred to as CEO), Secretary and such other officers as it deems necessary…."  Pursuant to this provision, in 2016 the Board of Managers named Triem as Greanex's President, Chief Executive Officer, and Secretary, making him responsible for finding new gob pile sites, setting up such sites, awarding contracts, submitting invoices, purchasing and deploying the x-ray sorting machines, and managing the day-to-day operations at Greanex.

31.     Triem was paid for his services and expenses were reimbursed under a Services Agreement between Greanex and Sotaco LLC (the "Greanex/Sotaco Service Level Agreement").

In total, Triem received approximately $300,000 in payments (not including expense reimbursements) for serving as President and Chief Executive Officer of Greanex. The Operating Agreement contained strict conflict of interest provisions. No additional compensation could be paid to a related party without full disclosure of the facts to each member of the Board of Managers and a majority vote.

32.     Thus, from the very start of the joint venture, and continuing until the fall of 2019, Triem was responsible to act for and on behalf of, and in the best interests of, Greanex as its President, Chief Executive Officer, Secretary, and as the Sotaco Manager on the Greanex Board of Managers.

33.     Contemporaneously with the execution of the Operating Agreement, Greanex entered into a Purchase and Sale Agreement for Equipment with Sotaco Inc., whereby Greanex purchased its first x-ray sorting machine from Sotaco Inc. for $910,345. Because, at the time, Greanex had little capital, UGC NA funded this entire purchase through a loan agreement with Greanex and a Greanex promissory note, and took a security interest in the x-ray sorting machine.

34.     At the time of this purchase and sale transaction Triem represented to Greanex (and Uniper) that Sotaco Inc. was the owner of this first x-ray sorting machine. Specifically, in the Purchase and Sale Agreement for Equipment between Greanex and Sotaco Inc., Triem (through Sotaco Inc.) represented and warranted that he had "purchased [the x-ray sorting machine] from [the German company]," he "owns the Equipment," and "now wishes to sell to [Greanex] sensor based coal sorting equipment." Those representations and warrantees were later determined to be false. Triem and Sotaco had merely leased the x-ray sorting machine. Sotaco did not own the machine and neither did Triem. Triem and Sotaco had no right to sell the x-ray sorting machine to Greanex.

35.     Prior to execution of agreements set forth above, Triem supplied false financial information to Uniper setting forth Sotaco's capital contribution.  Triem and Sotaco claimed that Sotaco owned the above mentioned x-ray sorting machine, valuing it at $825,000. They also fraudulently claimed another $25,170 in shipping costs.  They claimed that Sotaco had incurred expenditures with a company called J&S Consulting in connection with the Greanex venture, totaling $23,835, when in fact these expenditures were for an unrelated venture.  Further, Triem and Sotaco attempted to pass on charges they paid to other contractors as part of the setup of another project unrelated to Greanex.  This amount totaled $25,595.

36.     Had Uniper been aware of Triem's fraudulent activities, it never would have entered into the Greanex joint venture or any of the above mentioned agreements.

**B.     Uniper Provides Pre-Payment Coal Purchase Financing for the Joint Venture.**

37.     On August 30, 2016, Greanex and UGC SE entered into a "Master Coal Purchase and Sale Agreement" (the "MSA"), whereby UGC SE provided financing for the development and operations of Greanex in Kentucky, in exchange for Greanex providing UGC SE exclusive rights to purchase all of the saleable coal produced by Greanex.  Under the MSA, Greanex and UGC SE executed a series of Purchase and Sale Confirmations, whereby UGC SE would prepay Greanex for commercially saleable coal to be delivered in the future.  Importantly, the Master Coal Purchase Agreement gave UGC SE the right, but not the obligation, to purchase the saleable coal.  This meant that UGC SE had no contractual obligation to purchase the coal.

38.     The first such Purchase and Sale Confirmation under the MSA was executed on October 31, 2016, and UGC SE advanced funds under this Purchase and Sale Confirmation before Greanex began producing any coal.

39.     Under the first Purchase and Sale Confirmation, UGC SE agreed to prepay Greanex $1,600,000 in 2016 for 80,000 short tons ("st") of commercially saleable coal to be delivered to

UGC SE during the first quarter of 2017.  This would be the first of seven Purchase and Sale Confirmations under the MSA, totaling $33.927 million, as discussed further below.

### C.   Greanex Begins Coal Production at its First Pile in Phelps, Kentucky in Early 2017.

40.   Following extensive delays obtaining permits and getting the operations ready for production, Greanex began producing coal at its first coal pile in Phelps, Kentucky (the "Phelps Pile") in January 2017.

41.   Greanex needed additional capital to install a second x-ray sorting machine at the Phelps Pile; therefore, UGC SE entered into a second Purchase and Sale Confirmation with Greanex under the MSA on January 13, 2017 to help finance the Phelps operation.  Pursuant to that Confirmation, UGC SE prepaid Greanex approximately $1,600,000 in January 2017 for 80,000 st of commercially saleable coal to be delivered to UGC SE during Q2 2017.

42.    Triem continued to promise UGC SE that production volumes per month would substantially increase over the coming months.  Thus, based upon Triem's reports, by September of 2017 UGC SE expected Greanex's coal production volume to be approximately 1,800,000 st over the next three years.

43.   Based on representations by Triem, UGC SE entered into a fourth Purchase and Sale Confirmation[3] with Greanex in October 2017 and made $5,250,000 in prepayments to purchase an additional 300,000 st of commercially saleable coal to be delivered to UGC SE between January 1, 2017 and December 31, 2018.  Moreover, in December 2017, UGC SE amended its second Purchase and Sale Confirmation and prepaid another $3,850,000 for an

---

[3] In or around June 27, 2017, UGC SE entered into a third Purchase and Sale Confirmation with Greanex. This third Purchase and Sale Confirmation was executed as an amendment to the second sales confirmation to make necessary alignments with the previous confirmations.

additional 220,000 st of commercially saleable coal to be delivered to UGC SE between July 1, 2017 and June 30, 2018.

44.    In total, by the end of 2017, UGC SE had prepaid Greanex approximately $12,300,000 for 680,000 st of commercially saleable coal to be delivered by December 31, 2018.

**D.    Unjustified Greanex Payments To Contractor A.**

45.    After production on the Phelps Pile became more stable in early 2018 (at least according to the production reports delivered to Uniper at the direction of Triem), Greanex purchased the rights to operate the x-ray sorting machines at a second pile in Harlan, Kentucky (the "Harlan Pile").  To that end, and at Triem's selection and direction, Greanex hired a local contractor ("Contractor A") to construct foundations and install four x-ray sorting machines, conveyors, electrical supply, and compressor housing, as well as to construct bunkers and an underground feeding system to enable the delivery of waste coal feedstock to the x-ray sorting machines for the Harlan Pile. [4]

46.    Despite a detailed quotation, the installation services at the Harlan Pile were not in line with Contractor A's quotations.  For example, Contractor A never constructed bunkers or an underground feeding system at the Harlan Pile even though these were identified in Contractor A's quotation and Triem insisted to Uniper that bunkers and an underground feeding system were necessary to reduce operational costs by reducing the number of employees required to operate the x-ray sorting machines.  These aspects of the Harlan Pile installation also supported the additional Greanex costs associated with installation at Harlan, compared to the installation costs at the Phelps Pile.  Triem and Triem Associate 1 caused Greanex to pay Contractor A approximately

---

[4] Triem has a long association with Contractor A, an electrical contractor based in Kimper, Kentucky, having used Contractor A's services for the installation at the Phelps Pile.  Contractor A has a common shareholder with Contractor B, the licensed operator contracted by Greanex at Triem's direction to provide mining services at the Phelps Pile.

$1,100,000 to set up the Harlan Pile. This was true despite the fact that Triem and Triem Associate 1 did nothing to confirm that the work completed by Contractor A reflected the quoted and/or invoiced services, even though as President and Chief Executive Officer at Greanex (Triem) and a consultant paid by Greanex (Triem Associate 1), they were responsible for confirming (and reporting to UGC NA) the progress of development at the Harlan Pile.

47.     During these same periods, Greanex was also considering purchasing the rights to two additional gob piles for coal sorting and production. To that end, Greanex received two further quotations from Contractor A related to the two new piles.

48.     Contractor A issued one quote for the installation of two x-ray sorting machines at one of the new piles on January 16, 2018 for $676,156.04. Greanex partially paid this invoice in the amount of $338,078.02 on March 21, 2018. Contractor A issued the other quote on February 16, 2017 for $335,825.00 for the second of the two new piles, and Greanex partially paid that Contractor A invoice in the amount of $167,912.50 on April 21, 2017. Triem and Triem Associate 1 authorized both payments.

49.     Yet, Greanex never owned the rights to operate at the two new piles, so installation and operations never started, nor was any material work ever performed by Contractor A. In other words, for these two new piles, Greanex paid Contractor A around $506,000 to do almost nothing. Nonetheless, in both cases, the amounts paid by Greanex were never refunded to Greanex.

**E.     Unjustified Greanex Payments To Contractor B.**

50.     Triem, on behalf of Greanex, enlisted the help of Contractor B to provide labor services at the Phelps Pile. Contractor B was to provide all labor services at the pile, and was to charge Greanex for the costs of that labor each month. Triem told Contractor B to inflate the costs of labor each month by approximately $30,000 for "security services." Based on approval from

Triem Associate 1, Greanex paid these inflated invoices.  Sotaco then invoiced Contractor B for the costs of the security services, and was paid $30,000 per month.  Plaintiffs, on information and belief, allege that Triem Associate 1 also created the Sotaco invoices sent to Contractor B.

51.     Separately, and because it was unaware of the inflated Contractor B invoices, Greanex paid another company, separate and apart, from Contractor B or Sotaco for security services at the Phelps Pile.  As such, Triem and Sotaco received approximately $540,000 over the course of two years for services that were never performed for Greanex

**F.     Diversion of Greanex Assets To Sotaco Inc.**

52.     In addition to the false reporting issues, Triem caused Greanex to make payments to certain of its contractors for work that would never be performed at the Phelps and Harlan Piles, and Triem's off-shore company Sotaco Inc. then received payments from the same Greanex contractors.

53.     As one example, in December 2017 and January 2018, duplicate payments were made to Contractor B in the exact same amount for $153,337.92 for an "Operational Expense" at the Phelps Pile.

54.     After identifying these duplicate payments in August 2019, UGC SE contacted Contractor B.  The President of Contractor B confirmed to Uniper representatives that there was, indeed, a double payment and that Contractor B had forwarded $150,000 of the $153,337.92 duplicate payment to a Hong Kong bank account of Sotaco Inc. on the direct instructions of Triem.  Contractor B transferred the $150,000 to Sotaco Inc. in two wire transfer payments, the first on January 9, 2018 in the amount of $95,000 and the second on February 2, 2018 in the amount of $55,000.  Triem falsely claimed that the money was owed to Sotaco.

14

### G.     Additional Kickbacks to Triem And Sotaco.

55.     As noted above, Triem arranged for inflated bids submitted to Greanex by certain contractors, and Greanex paid for services that were never rendered.

56.     Following the discovery of Triem's conversion of the $150,000, UGC SE investigated to see if there were further payments made from Greanex contractors to Triem. During these discussions, UGC SE discovered that Contractors A and B had paid a total of $1,305,000 from 2017 through 2019 to Sotaco Inc.  Wire transfer records obtained from Contractors A and B show that these payments occurred regularly.

57.     When interviewed on October 24, 2019, Triem admitted that he would receive "a bit of commission here, a bit of commission there" from Contractors A and B.

### H.     Sotaco Fake Invoice to Greanex.

58.     In addition to the above, Triem attempted to obtain payments from Greanex to which he was not entitled.  On February 25, 2019, for example, Triem invoiced Greanex $200,000 through Sotaco LLC for "[s]et up fees for the coordination of the installation at the Harlan pile 50.000 USD per each X-Ray unit."  No legitimate justification existed for this invoice.

### I.     UGC SE Continues to Prepay for Coal Through March of 2019, as Triem Continues to Defraud and Mismanage Greanex.

59.     At the same time that Triem was mismanaging Greanex and diverting Greanex funds to himself and his affiliates and associates, UGC SE was still advancing funds in an effort to keep Greanex afloat.

60.     On April 13, 2018, UGC SE entered into a fifth Purchase and Sale Confirmation with Greanex pursuant to which UGC SE prepaid $6,000,000 for an additional 300,000 st of commercially saleable coal to be delivered to UGC SE between January 1, 2019 and December 31, 2020.

61.     On May 27, 2018, UGC SE entered into a sixth Purchase and Sale Confirmation with Greanex pursuant to which UGC SE prepaid $4,000,000 for an additional 200,000 st of commercially saleable coal to be delivered to UGC SE between January 1, 2019 and December 31, 2020.

62.     On October 2, 2018, UGC SE entered into a seventh Purchase and Sale Confirmation with Greanex pursuant to which UGC SE prepaid $4,000,000 for an additional 200,000 st of commercially saleable coal to be delivered to UGC SE between January 1, 2019 and December 31, 2020.

63.     And finally, on March 15, 2019, UGC SE entered into an eighth Purchase and Sale Confirmation with Greanex pursuant to which UGC SE prepaid $6,000,000 for an additional 300,000 st of commercially saleable coal to be delivered to UGC SE between March 20, 2019 and December 31, 2019.

64.     In total, by March 2019, UGC SE had prepaid Greanex $32,300,000 for 1,680,000 st of commercially saleable coal to be delivered during the period ending December 31, 2020.  Yet, Greanex had delivered just 150,757 st of coal by the end of June 2019.  This was 529,243 st less coal than was contracted to be delivered by June 2019.  Throughout the period of the venture Uniper was routinely lied to about the amounts of coal being produced.

**J.     Uniper Uncovers The Fraud.**

65.     On June 8, 2019, Uniper contracted with an external surveyor, Inspectorate, to conduct an independent inspection on the reported coal volumes and quality at the Harlan Pile. The results showed significant delivery deficiencies and quality issues.

66.     Weekly and daily reports on coal volumes produced at the Harlan Pile were sent to Uniper by Triem or by others at Triem's direction.  These reports were essential to Uniper's

decision to continue to fund Greanex through the prepayments for coal that were to be delivered in the future under the above-mentioned Purchase and Sale Confirmations.

67.     According to the weekly reports on the production volumes sent by e-mail to Uniper, 56,669 st of commercially saleable coal were assumed available at the Harlan Pile as of the time of the Inspectorate's inspection during the week of June 24, 2019.  However, based on the Inspectorate report, only 6,267 st were reported to be on-site at the Harlan Pile with a further 1,911 st having been transported to load out for delivery and export.

68.     After Uniper raised this issue with Triem, Triem travelled to the Harlan site.  From Kentucky, Triem wrote to UGC SE on June 27, 2019 that around 30,000 st were at the Harlan Pile at that time.  This was still far below the volumes set forth in the weekly reports, but about five times greater than what Inspectorate reported.

69.     Because UGC SE's decisions to prepay more than $32,300,000 for commercially saleable coal had been entirely predicated on these weekly and daily production reports and what Triem led UGC SE to believe Greanex's coal production volumes would be going forward, UGC SE initiated a further investigation by its internal audit team into the coal operations and production at Greanex.

70.     On June 28 and 29 of 2019, representatives of Uniper met with Witness A, a senior Greanex employee, in Kentucky and asked him about the operations at both the Harlan and Phelps Piles.  While Witness A was explaining the setup and operations to Uniper, he admitted that production numbers had been falsified (and hidden from Uniper) for years.  According to Witness A, Triem specifically instructed him to report higher production numbers than the coal that was actually produced.  This was the first time Uniper learned of Triem's fraud.

**K.** **Examples of False Production Communications Between Triem, Witness A and Witness B.**

71.     For example, Witness A explained that on March 28, 2019, Triem told him that Uniper had requested a report on daily coal volumes, and that Triem and Witness A should "talk first which numbers we put in."

72.     Similarly, on April 12, 2019, Witness B, who was employed by a contractor working on site at the Harlan Pile and helped to gather data on daily Greanex coal production, sent Triem and Witness A production volumes for April 11, which reflected 5,120 st of raw tons, 512 clean tons, 2,512 rock tons, and 3,024 st sorted at the Harlan Pile during the dayshift.[5]  When Witness B asked "how does these look for yesterday," Triem responded, "how was the reality?" Witness B reported that the reality for the dayshift was just 3,480 st, that is, more than 1,500 st of raw tons less than the number he previously asked about reporting.  Triem gave Witness B his approval to send out the false higher numbers, which were later reported to Uniper by Witness A.

73.     As another example of this aspect of the fraud, on June 13, 2019, Triem again instructed Witnesses A and B to provide fraudulent coal production numbers to be reported in the next weekly report to Uniper.  During the week of June 3, 2019, Witness B knew that the Harlan Pile was producing, on average, 5,094 st per shift.  Because Triem was concerned that UGC SE would cut off payments to Contractor A for its outstanding invoices and stop advancing funds to Greanex as prepayments for coal, Triem instructed Witness B to make sure that the "next report [was] close to 9000st per shift," which would mean approximately 18,000 st per day.  Those false

---

[5] Witness A was responsible for sending weekly production reports to Uniper via email, while Witness B was responsible for sending daily production numbers to Uniper via text messages.  Triem told both Witness A and Witness B that he must approve the production numbers before the numbers were reported to Uniper on either a daily or weekly basis.

numbers were exactly what Witness A reported in the weekly report to UGC SE the following week.

74.     Triem's fraudulent reporting continued into late June and early July of 2019.  After Triem was told by Witness B that the Harlan Pile had produced just 250 clean tons during the June 27, 2019 dayshift and 252 clean tons during the night shift, Triem instructed Witness B not to send the daily report because the "numbers look[ed] not good."  Triem then revised the coal production numbers upwards for the day from 502 st to 920 st.

75.     On June 28, 2019, Witness B provided Triem with the actual production numbers for the day.  Again, Triem responded that "this looks not good . . . with 4 machines" and directed Witness B to change the 511 st of coal produced upward to 911 st of coal that day.  These false coal production volumes were then provided by Witness A to UGC SE in the weekly report on July 1, 2019.

76.     In late June 2019, Witness A told Uniper representatives that earlier in 2019, he began putting an annotation "TITL" on the weekly reports sent to Uniper for the reported coal production numbers.  According to Witness A, this abbreviation stood for "**T**his **I**s a **T**otal **L**ie".  Uniper did not understand the meaning of TITL, thinking it was an abbreviation for "Total."  That annotation was later confirmed by UGC SE (the annotation was in use from the third calendar week until the thirteenth calendar week in 2019) as evidenced by the below snap shot of the weekly report for the fifth calendar week of 2019:

| | DATE | TONNAGE RAWL | Coal tonnage per day | Rock tonnage per day | Infeed per sorter per day | TONNAGE HAULED TO LOADOUT 10,770.92 | Side #1 down time | SIDE #2 down time | BTU | ASH | Moisture | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | 1/28/19 | 7800 | 910 | 2967 | 3877 | 0 | | | | | | |
| ☐ | 1/29/19 | 7760 | 892 | 2974 | 3866 | 803.42 | | | | | | |
| ☐ | 1/30/19 | 8600 | 994 | 3540 | 4534 | 758.23 | | | | | | |
| ☐ | 1/31/19 | 9680 | 1066 | 4022 | 5088 | 0 | | | | | | |
| ☐ | 2/1/19 | 9660 | 1063 | 4065 | 5128 | 391.50 | | | | | | |
| ☐ | | | | | | 0 | | | | | | |
| ☐ | | | | | | | | | | | | |
| ☐ | TOTALS | 43500 | 4925 | 17568 | | 1961.15 | | | | | | |
| ☐ | AVERAGE | | | | | Total at LOADOUT 12,/21.15 | | | | | TITL | |

**GREANEX TOTALS PER WEEK 05-2019**

77.     During a further interview with Uniper representatives, Witness A confirmed again that he reported inflated and fraudulent coal production numbers at the direction of Triem.

78.      Furthermore, Witness A stated that the figures had been reported fraudulently and based on estimates since within the first three months of the start of the joint venture when Triem was reporting weekly coal production volumes himself.  For example, even though Greanex was having a number of problems with the x-ray sorting machines when the joint venture started, Triem instructed Witness A to report higher production numbers to Uniper, claiming that Greanex needed to report higher production numbers to Uniper so that Greanex could get more funding and purchase other x-ray sorting machines.

**L.        Inflated Production Numbers Through Fines and Waste.**

79.     Witness A also revealed that Triem had directed that worthless waste products be added to the coal being shipped to UGC SE in order to falsely inflate the tonnage. As just one example, Triem instructed contractors of Greanex to dump "fines," which were coal production rejects that were sorted out by the x-ray sorting machines, back into loading trucks after the sorting

process to make it seem as though Greanex was delivering more commercially saleable coal than it really was.  As another example Triem instructed a contractor of Greanex not to thoroughly wash the coal to remove the fines even though Uniper had paid the contractor for this service.  The additional weight of the fines, of course, increased the tonnage of materials that Greanex purportedly delivered to UGC SE.

80.     Witness B has confirmed many of the details provided by Witness A and the documentary evidence set forth above.

**L.     Triem Attempts To Defraud An Unsuspecting Investor Buyer**

81.     Having successfully defrauded Uniper, Triem moved to his next target – an unsuspecting private equity investment company.   In early 2019, Triem solicited potential purchases for Sotaco LLC's interest in Greanex or for the entire Greanex joint venture.   On information and belief, Triem did not disclose to potential investors or purchasers that Greanex was built on a foundation of fraudulently obtained funding from Uniper, that the coal production numbers were false, that worthless material had been added to coal volumes being delivered to UGC SE, that more than a million dollars in kickbacks had been obtained by him, and that large sums of Greanex funds had been diverted to Sotaco.  Rather he, and on information and belief, Triem Associate 1, presented Greanex as an excellent investment opportunity for the unsuspecting potential buyers.  Sotaco and Triem stood to earn at least $12,500,000 under the proposed deal. Still unaware of the fraud being perpetrated on it, Uniper as majority member of Greanex refused to approve the sale for reasons unrelated to the still undiscovered truth about Triem's looting of Greanex.

**M.     Triem is Removed From Control**

82.     In August 2019, the Greanex Board of Managers (over Triem's objection) directed that Greanex not request or authorize further services from Sotaco LLC under the service level

agreement and replaced Triem as Secretary at Greanex.  On September 12, 2019, after confirming

earlier reports of the falsified reporting and the kickback payments from Greanex contractors, the

Uniper representatives on the Board of Managers moved to remove Triem as President and Chief

Executive Officer and replaced Triem with an interim President, Chief Executive Officer, and

Chief Restructuring Officer.  This individual was a member of Uniper's commercial group

experienced in the coal industry who was tasked with determining the current state of affairs on

the ground in Kentucky, attempting to resolve Greanex's working capital issues due to Triem

siphoning off Greanex funding, and assisting Greanex and Uniper in determining the full extent of

the fraud committed by Triem and his associates.

83.     It quickly became apparent that the joint venture had not only been the victim of

Triem's multiple fraudulent schemes, but also that Greanex had been systematically mismanaged

and was struggling financially.  Indeed, by September 2019, Greanex was in substantial debt and

was incurring $1,000,000 per month of contractual and operational expenses, with only $155,000

of cash on hand.

84.     One blatant example of this mismanagement was that UGC SE immediately

identified that Greanex, under Triem's direction, had purchased far too much equipment, most of

which was not being used at either the Phelps or Harlan Piles.  As of April 13, 2018, Greanex had

ordered sixteen (16) x-ray sorting machines, although only six (6) were in use.  Indeed, Greanex

had purchased so many x-ray sorting machines that it had no place to store them.

85.     After further investigation, the German company informed UGC SE that Triem had

entered into a side agreement with the German company pursuant to which Sotaco would receive

a payment equal to the balance outstanding to the German company from Sotaco for leasing the

first x-ray sorting machine, a value of approximately $500,000, but only if Greanex purchased nine

(9) or more additional machines.  Fortunately for Uniper, the German company recognized certain irregularities in its own relationship with Triem and did not pay this amount to Sotaco or Triem. Nevertheless, the damage was already done to Greanex, since Greanex had paid for more than nine (9) x-ray sorting machines (each costing around $818,000) that it did not need.

86.     In short, by the late fall of 2019, it had become abundantly clear that Triem had committed a massive fraud and mismanaged Greanex for his own benefit and at the expense of Greanex and Uniper.

### COUNT I
### Violation of Civil RICO, 18 U.S.C. § 1962(c)
### (Against Triem, Sotaco Inc., and Sotaco LLC)

87.     Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

88.     Beginning in at least 2016 and continuing through at least 2019, Defendants Triem, Sotaco Inc., and Sotaco LLC, and Non-Defendant Witnesses A and B were associated in fact and with an enterprise which conducted its affairs through a pattern of racketeering activity, and whose conduct and activities affected interstate and foreign commerce.

89.     The enterprise, referred to above as the Triem Fraud Team, consists of an association in fact comprised of Defendants Triem, Sotaco Inc., Sotaco LLC, and Non-Defendants Witnesses A and B.  All agreed to and did conduct the affairs of the Triem Fraud Team enterprise through a pattern of racketeering.  Alternatively, the enterprise is Greanex.  All Defendants and Witnesses A and B agreed to and did conduct the affairs of the Greanex Enterprise through a pattern of racketeering.

90.     Pursuant to and in furtherance of their fraudulent scheme, the Triem Fraud Team committed multiple related acts which include: acts in violation of: (i) 18 U.S.C. § 1343 (wire

fraud); and (ii) 18 U.S.C § 2314 (causing the transportation of money and funds having a value of $5,000 or more in interstate commerce by means of fraud).

91.     The predicate acts alleged herein occurred after the effective date of 18 U.S.C. § 1961, *et. seq*. and the last such act occurred within ten years after commission of a prior act of racketeering activity.  These racketeering activities include repeated acts of:

92.     **Wire Fraud – 18 USC § 1343.**  The Triem Fraud Team devised, and intended to devise, a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises.  For the purpose of executing the scheme to defraud and attempting to do so, the Triem Fraud Team did transmit and caused to be transmitted by means of wire communications in interstate and foreign commerce.

93.     Based on the limited information available to Plaintiffs at this time, there are thousands of predicate acts committed by the Triem Fraud Team.  Examples include:

94.     **Use of Interstate Wire Communications**. Each email and text message below constitutes a transmission, writing, sign or signal by means of interstate or foreign commerce sent in furtherance of the scheme to defraud.

| Date | Description | From | To |
|------|-------------|------|-----|
| April 20, 2017 | Email stating invoice from Contractor A for setup of Justice Pile that never actually occurred is "approved." | Triem Associate 1<br>Sotaco Inc.<br>Germany | Torsten Walter<br>UGC SE<br>Germany |
| February 5, 2018 | Email stating invoice from Contractor A for installation of x-ray sorting machines that was never completed is "approved." | Triem Associate 1<br>Sotaco Inc.<br>Germany | Torsten Walter<br>UGC SE<br>Germany |

| January 28, 2019 – February 1, 2019 | Email attaching weekly production numbers containing abbreviation "TITL" which stands for "This Is A Total Lie" | Witness A<br><br>Kentucky | Torsten Walter<br><br>Gustavo Fernandez<br><br>UGC SE<br><br>Germany |
|---|---|---|---|
| March 28, 2019 | Text message stating "let's talk about what numbers to put in" [relating to the coal tonnage report to Uniper] | Rainer Triem,<br><br>Germany | Witness A<br><br>Kentucky |
| April 12, 2019 | Text message from Witness B stating "how does this look for yesterday?" [relating to the proposed false tonnage report to be sent to Uniper]<br><br>Triem responds "how was the reality" | Witness B<br><br>Kentucky | Rainer Triem<br><br>Germany |
| June 13, 2019 | Email stating "please send the next report close to 9000 st [standard tons] per shift." | Rainer Triem<br><br>Germany | Witness B<br><br>Kentucky |
| June 27, 2019 | Email stating that there was around 30,000 st at the Harlan pile, attempting to discredit the Inspectorate report | Rainer Triem<br><br>Germany | Torsten Walter, Martin Rozendaal, Martin Rickwood<br><br>UGC SE<br><br>Germany; United Kingdom |
| June 27, 2019 | Text messages where Witness B reports the actual tonnage numbers. Triem states "numbers looks not good. will check these numbers tomorrow morning. no report | Rainer Triem<br><br>Germany | Witness A<br><br>Witness B<br><br>Kentucky |

| | tonight in the loop." Triem then changes the numbers by adding 200 tons of rock to clean tons of coal | | |
|---|---|---|---|
| June 30, 2019 | Text messages reporting actual production numbers for June 28, 2019 production. Triem adjusted clean coal volume by 400 tons over both shifts. | Rainer Triem<br><br>Germany | Witness A<br><br>Witness B<br><br>Kentucky |

95.  **Additional Wire Transmissions.**  Each invoice described in Paragraph 94 were transmitted via means of wire communication.

96.  **Transportation of Funds In Interstate Commerce Obtain By Fraud.**  Each entry below describes a payment sent by Uniper or Greanex due to the fraud:

| Date | Description | Payment From | Payment To | Amount |
|---|---|---|---|---|
| July 7, 2016 | Greanex first installment payment for x-ray sorting machine from Sotaco | Greanex | Sotaco Inc. | $728,276.00 |
| November 2, 2016 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $100,000.00 |
| November 14, 2016 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $325,000.000 |
| November 29, 2016 | UGC SE advancement of | UGC SE | Greanex | $20,000.00 |

| | funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | | | |
|---|---|---|---|---|
| December 2, 2016 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $300,000.00 |
| December 12, 2016 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $300,000.00 |
| December 23, 2016 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $260,000.00 |
| December 28, 2016 | Greanex second installment payment for x-ray sorting machine from Sotaco | Greanex | Sotaco Inc. | $182,069.00 |
| January 10, 2017 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $350,000.00 |
| January 24, 2017 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $100,000.00 |
| January 30, 2017 | UGC SE advancement of funds under the Addendum to Purchase and Sale | UGC SE | Greanex | $10,000.00 |

| | Confirmation (signed Oct. 31, 2016) | | | |
|---|---|---|---|---|
| January 31, 2017 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed Oct. 31, 2016) | UGC SE | Greanex | $9,000.00 |
| January 31, 2017 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed January 13, 2017) | UGC SE | Greanex | $91,000.00 |
| February 8, 2017 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed January 13, 2017) | UGC SE | Greanex | $325,000.00 |
| February 17 2017 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed January 13, 2017) | UGC SE | Greanex | $50,000.00 |
| February 24, 2017 | UGC SE advancement of funds under the Purchase and Sale Confirmation (signed January 13, 2017) | UGC SE | Greanex | $100,000.00 |
| On or about October 2017 | UGC SE advancement of funds under Amended Purchase and Sale Confirmation (signed Oct. 2017) | UGC SE | Greanex | $5,250,000.00 |
| November 10, 2017 | Commission payment to Sotaco | Contractor B | Sotaco Inc. | $20,000.00 |

| November 28, 2017 | Commission payment to Sotaco | Contractor B | Sotaco Inc. | $20,000.000 |
| On or about December 2017 | UGC SE advancement of funds under Amended Purchase and Sale Confirmation (signed Dec. 2017) | UGC SE | Greanex | $3,850,000.00 |
| December 28, 2017 | Payment for Misc. Operational Expense for Jan. | Greanex | Contractor B | $153,337.92 |
| January 8, 2018 | Payment for Misc. Operational Expense for Jan. | Greanex | Contractor B | $153,337.92 |
| January 9, 2018 | Wire Transfer from Contractor B to Sotaco Inc. | Contractor B | Sotacto Inc. | $95,000 |
| January 26, 2018 | Wire Transfer from Contractor B to Sotaco Inc. | Contractor B | Sotaco Inc. | $55,000 |
| March 1, 2018 | Commission payment to Sotaco | Contractor A | Sotaco Inc. | $75,000.00 |
| March 2, 2018 | Commission payment to Sotaco | Contractor B | Sotaco Inc. | $75,000.00 |
| March 9, 2018 | Commission payment to Sotaco | Contractor A | Sotaco Inc. | $75,000.00 |
| March 26, 2018 | Commission payment to Sotaco | Contractor A | Sotaco Inc. | $100,000.00 |
| March 27, 2018 | Commission payment to Sotaco | Contractor A | Sotaco Inc. | $100,000.00 |
| On or about April 13, 2018 | UGC SE advancement of funds under Purchase and Sale Confirmation (signed April 13, 2018) | UGC SE | Greanex | $6,000,000.00 |
| April 27, 2018 | Commission payment to Sotaco | Contractor A | Sotaco Inc. | $50,000.00 |

| On or about May 27, 2018 | UGC SE advancement of funds under Purchase and Sale Confirmation (signed May 27, 2018) | UGC SE | Greanex | $4,000,000.00 |
|---|---|---|---|---|
| June 5, 2018 | Commission payment to Sotaco | Contractor A | Sotaco Inc. | $75,000.00 |
| August 29, 2018 | Commission payment to Sotaco Inc. | Contractor B | Sotaco Inc. | $30,000.00 |
| On or about October 2, 2018 | UGC SE advancement of funds under Purchase and Sale Confirmation (signed Oct. 2, 2018) | UGC SE | Greanex | $4,000,000.00 |
| October 5, 2018 | Commission payment to Sotaco Inc. | Contractor B | Sotaco Inc. | $30,000.00 |
| December 4, 2018 | Commission payment to Sotaco Inc. | Contractor B | Sotaco Inc. | $30,000.00 |
| January 25, 2019 | Commission payment to Sotaco | Contractor A | Sotaco Inc. | $140,000.00 |
| February 6, 2019 | Commission payment to Sotaco Inc. | Contractor B | Sotaco Inc. | $30,000.00 |
| March 7, 2019 | Commission payment to Sotaco Inc. | Contractor B | Sotaco Inc. | $30,000.00 |
| On or about March 15, 2019 | UGC SE advancement of funds under Purchase and Sale Confirmation (signed March 15, 2019) | UGC SE | Greanex | $6,000,000.00 |
| August 20, 2019 | Commission payment to Sotaco Inc. | Contractor B | Sotaco Inc. | $15,000.00 |

97.     Defendants Triem, Sotaco Inc. and Sotaco LLC each had a role in the racketeering enterprise that was distinct from the Triem Fraud Team.

98.     Uniper's business and property were injured as a direct and proximate result of the Triem Fraud Team's violations of 18 U.S.C. § 1962(c), including by reason of the predicate acts constituting the pattern of racketeering injury, as alleged with greater particularity in the foregoing paragraphs.

99.     As a result of the Triem Fraud Team's violations of 18 U.S.C. § 1962(c), Uniper suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c), Uniper is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of the Triem Fraud Team's violations of 18 U.S.C. § 1962(c).

## COUNT II
### Conspiracy to Violate Civil RICO, 18 U.S.C. § 1962(d)
### (Against Triem, Sotaco Inc., and Sotaco LLC)

100.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

101.    Defendants Triem, Sotaco Inc., and Sotaco LLC conspired with one another and with Non-Defendant Witnesses A and B to violate 18 U.S.C. § 1962(c) and committed at least one overt act in furtherance of said conspiracy.

102.    As a result of the Triem Fraud Team's violations of 18 U.S.C. 1962(d), Uniper suffered substantial damage.

## COUNT III
### Fraud
### (Against Defendant Triem)

103.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

104.    At the outset, Triem fraudulently induced Uniper to enter into the Greanex joint venture by falsifying the amount of Sotaco's capital contribution and, in reliance, Uniper was defrauded of the $1 million it paid to Greanex through its initial funding round.

105.    In connection with the MSA and the Purchase and Sale Confirmations executed thereunder, Triem, as the President, Secretary, and Chief Executive Officer of Greanex, caused false and/or misleading information about Greanex's coal production to be provided to UGC SE and omitted material information or otherwise affirmatively misrepresented material information when communicating with UGCSE in connection with the business affairs of Greanex.

106.    Triem knew his numerous representations and omissions, each of which is discussed above, to be materially false and misleading at the time he made those representations because Triem had actual knowledge of material facts directly contrary to his representations and failed to disclose those material facts.

107.    Specifically, Triem had actual knowledge that Greanex's reported weekly coal production volumes were false and/or misleading when he directed Witness A and Witness B to falsify and submit Greanex's weekly reports to Uniper.

108.    In addition, Triem had actual knowledge that Sotaco Inc. had received (at least) $1,305,000 from Contractor A and Contractor B in kickbacks, yet failed to disclose that fact to Uniper or Greanex.

109.    Each of Triem's material misrepresentations and omissions, if corrected, would have altered the total mix of Uniper's decision-making when considering whether to continue to prepay for Greanex coal to be delivered in the future under the Purchase and Sale Confirmations. This also permitted Triem to continue to extract payments from Greanex contractors and suppliers, and to siphon funds from Greanex to himself and his affiliates, including, without limitation, his

compensation from Greanex by way of service level agreement payments to Sotaco LLC, and improper payments to Contractors A and B, a portion of which were then forwarded to Sotaco Inc. for Triem's personal benefit.

110.    Uniper has been proximately harmed by Triem's material misrepresentations and omissions in an amount to be determined at trial.

**COUNT IV**
**Breach of Fiduciary Duty**
**(Against Defendants Triem and Sotaco LLC)**

111.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

112.    Triem, by virtue of his positions of President, Chief Executive Officer, Secretary and Manager of Greanex, owed, at all relevant times, fiduciary duties to Greanex and to its Members.

113.    At all relevant times during Triem's tenure as a Greanex President, Chief Executive Officer, and Secretary and when Triem acted as the Greanex Manager appointed by Sotaco LLC under the Operating Agreement, Sotaco LLC, as a *de facto* controlling member of Greanex with respect to the transactions described above owed fiduciary duties to Greanex and its Members.

114.    Triem and Sotaco LLC breached their fiduciary duties by, among other things, (i) falsifying and inflating Greanex's production volumes, (ii) diverting to Sotaco, and accepting funds properly owed to Greanex, and (iii) mismanaging Greanex, including by paying contractors for services never rendered and purchasing equipment that was not needed, in exchange for kickbacks.

115.    As a proximate result of these breaches, Plaintiffs have been harmed in an amount to be determined at trial.

## COUNT V
## Aiding and Abetting Breaches of Fiduciary Duty
## (Against Defendant Sotaco Inc.)

116.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

117.    Triem and Sotaco LLC owed fiduciary duties to Greanex and its Members and breached those duties by, among other things, (i) falsifying and inflating Greanex's production volumes, (ii) diverting and accepting funds properly owed to Greanex to Sotaco, and (iii) mismanaging Greanex, including by paying contractors for services never rendered and buying equipment that was not needed, in exchange for kickbacks.

118.    Sotaco Inc. was aware of Triem and Sotaco LLC's wrongful conduct at the time of the breach.

119.    Sotaco Inc. knowingly participated in the breaches by, among other things, diverting and directing to Sotaco funds properly owed to Greanex and approving and receiving payments from Greanex for services never rendered.

120.    As a result of Sotaco Inc.'s misconduct, Plaintiffs have been harmed in an amount to be determined at trial.

## COUNT VI
## Unjust Enrichment
## (Against Defendants Triem, Sotaco Inc., and Sotaco LLC)

121.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

122.    Triem, Sotaco LLC, and Sotaco, Inc. were enriched by, among other things, receiving payments that were owed to Greanex and/or for funds diverted by contractors for work that was never performed for Greanex.

123.    Triem, Sotaco LLC and Sotaco, Inc. have been unjustly enriched by their receipt of the double payment and kickbacks paid for work never performed for Greanex, and Greanex has been correspondingly harmed.

124.    Triem, Sotaco LLC, and Sotaco, Inc. have failed to make restitution to Greanex for the benefit that Plaintiff Greanex conferred upon these Defendants.

125.     Triem, Sotaco LLC, and Sotaco, Inc. would be unjustly enriched if they were not required to remit to Greanex the double payment and monies kickbacked to defendants for work never performed for Greanex.

126.    In equity, good conscience, and justice, Triem, Sotaco LLC, and Sotaco, Inc. should not be entitled to retain the windfall or economic benefits that were conferred upon these Defendants when these Defendants received the double payment and kickbacks for work never performed.

## COUNT VII
### Conspiracy
### (Against All Defendants)

127.     Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

128.    All Defendants engaged in a series of unlawful acts described above in furtherance of Triem's fraud and breaches of fiduciary duty.

129.    As a result of Defendants conduct, Plaintiffs have suffered actual harm in the form of money damages.

35

**COUNT VIII**
**Breach of Contract**
**(Against Defendant Sotaco Inc.)**

130.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

131.    On July 6, 2016, Sotaco Inc. entered into a Purchase and Sale Agreement with Greanex, whereby Sotaco Inc. agreed to sell and Greanex agreed to buy a x-ray sorting machine for $910,345.00

132.    In connection with Purchase and Sale Agreement, Sotaco Inc. represented and warranted in Section 11 of the Agreement that it owned the x-ray sorting machine and the rights associated therewith.

133.    At the time, Sotaco Inc.'s representation was false as Sotaco Inc. was merely leasing the x-ray sorting machine and was not its owner.

134.    As a result, Sotaco Inc. breached the Purchase and Sale Agreement.

135.    Greanex has suffered actual harm in the form of money damages as a result of Defendant's conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests the Court enter an Order:

a)      Trial by jury on all issues so triable;

b)      Entering judgment in favor of Plaintiffs against Defendants;

c)      Awarding Plaintiffs monetary, treble, and punitive damages for Defendants' wrongful conduct;

d)      Ordering disgorgement of all fees, expenses or compensation paid to or profits earned by Defendants;

e)      Removing Triem as a Manager of Greanex;

36

f)       Restricting Sotaco LLC's ability to appoint a Manager of Greanex, and permitting the two Greanex Managers appointed by UGC NA to manage Greanex in the best interests of its Members, but without regard to limitations in the Operating Agreement requiring the participation or consent of the Sotaco LLC Manager or Sotaco LLC as a Member;

g)       Awarding Plaintiffs all reasonable out-of-pocket costs and expenses for this action, including, without limitation, reasonable attorneys' fees and costs incurred in connection with such action; and

h)       Granting any other relief the Court deems just and proper.

Dated:  March 17, 2020

OF COUNSEL:

REED SMITH LLP
Brian M. Rostocki
Benjamin P. Chapple
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
(302) 778-7500

Nicholas R. Rodriguez
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
(215) 851-8100

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

/s/  *Jordan M. White*
Donald J. Kelly
Jordan M. White
400 W. Market Street, Suite 2000
Louisville, KY 40202
E-mail: dkelly@wyattfirm.com
E-mail: jwhite@wyattfirm.com
Tel. (502) 589-5235
Fax (502) 589-0309

*Counsel for Plaintiffs*